# **AFFIDAVIT**

I, Paul Altenburg, being first duly sworn, hereby depose and state as follows:

**Introduction and Agent Background**

1. I am assigned as a Special Agent (SA) with the United States Department of Homeland Security, Homeland Security Investigations (HSI), in Burlington, Vermont. HSI is responsible for enforcing over 400 federal criminal statutes of the United States. I am a law enforcement officer of the United States, and I am authorized by law to conduct investigations and to make arrests for felony offenses. I have been a Special Agent since 2010, and I have been assigned to the Burlington office since September 2018.

2. In connection with my duties and responsibilities, I have received extensive training in criminal investigations, including investigations involving transnational and domestic narcotics trafficking and distribution and money laundering. I have participated in surveillance operations, arrests, and interviews of individuals involved in illicit narcotics trafficking and distribution into and within the United States. I have written affidavits in support of search warrants and have participated in the execution of several warrants in addition to those for which I personally applied for, including Global Positioning System (GPS) tracking warrants.

3. I am submitting this affidavit in support of an application, pursuant to Rule 41(e)(2)(C) and 18 U.S.C. § 3117 for a warrant authorizing HSI agents and/or the Vermont State Police (VSP) working with the agents to surreptitiously install, monitor, repair, replace, and use a real-time GPS mobile tracking device for 45 days (from the date the warrant is issued) on the following motor vehicle, located in the District of Vermont, for the purpose of monitoring and recording data regarding the movement of this motor vehicle both inside and outside the

District of Vermont: 2008 Honda Civic, silver in color, bearing Vermont registration HSH550 and VIN 2HGFG12838H531359 (the SUBJECT VEHICLE).

4. The Vermont Department of Motor Vehicles (DMV) records show that the SUBJECT VEHICLE is registered to Nicholas Martel of 133 Rock Maple Drive, Georgia, Vermont. For the reasons described below, however, I believe the vehicle is primarily—if not exclusively—operated by Robert RIDEOUT.

5. Based on the facts set forth in this affidavit, I submit there is probable cause to believe that the SUBJECT VEHICLE is being used, and will continue to be used, to facilitate violations of 21 U.S.C. § 841—the distribution of, and possession with intent to distribute, controlled substances—and that the data obtained from the GPS device about the geographic location of the SUBJECT VEHICLE will constitute, and will lead to, evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of the individuals who are committing those crimes, including, for example, where and when narcotics transactions occur.

6. The facts in this affidavit come from my training and experience, my review of documents and reports, and conversations with the other HSI Special Agents, HSI Task Force Officers, and other law enforcement officers. This affidavit is intended to demonstrate that there is probable cause for the requested warrant and does not set forth all my knowledge about the matter. Unless otherwise specified, any witnesses' statements included below are related in sum and substance and are not intended to be quotations.

7. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics. I am also familiar with the manner in which narcotics traffickers use personal and

rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

8. Based on my training and experience, trafficking in narcotics typically involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. Within the United States and the District of Vermont, illegal drugs and drug money frequently are transported in motor vehicles. Consequently, the location of vehicles used by narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

9. More broadly, based upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, prepared for distribution, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions, and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

10. Based on my training and experience, tracking narcotics traffickers in motor vehicles often corroborates and verifies other information and investigative leads derived from other investigative techniques, including informants, wiretaps, and visual surveillance.

## Probable Cause

11. In May 2021, HSI Burlington Special Agents received information from a source of information (SOI)[1] that Robert "Bobby" RIDEOUT (year of birth 1963) was selling cocaine and heroin around the Burlington, Vermont area from a silver Honda Civic and from his hotel room at the Quality Inn in Shelburne, Vermont. The SOI provided the license plate number for the Honda Civic as Vermont registration HSH-550 (the SUBJECT VEHICLE) which RIDEOUT just recently purchased from Nicholas Martel, based on RIDEOUT's statements to the SOI. The SOI stated Martel is not involved with RIDEOUT, and the vehicle transaction was a private sale.

12. I am also aware that law enforcement had received previous information about RIDEOUT's criminal activities from other sources. On April 27, 2021, Vermont State Police (VSP) Narcotics Investigations Unit (NIU) confidential informant 20JR15 provided information that RIDEOUT was responsible for the straw purchase of a firearm.[2] 20JR15 explained that RIDEOUT's daughter Tiffany purchased the firearm and subsequently filed a false theft report

---

[1] The SOI is known to law enforcement and has a history of providing information to law enforcement that resulted in narcotic seizures. The SOI is not working for financial remuneration or in hopes of consideration on pending charges. Based on a review of law enforcement databases, I am familiar with the following convictions for the SOI: excessive speed, disorderly conduct, negligent operation, and driving while intoxicated.

[2] 20JR15 has previously provided information to NIU that lead to the seizure of controlled substances, and I personally worked with 20JR15 in a previous controlled purchase and found 20JR15 to be reliable. I have been informed by NIU that 20JR15 has the following convictions: Cocaine Possession under 2.5 grams, Disorderly Conduct-Fight etc. x 2, and Transportation Alcohol/Drug Into Detention Center.

4

with the Burlington Police Department (BPD). 20JR15 further advised that RIDEOUT and another coconspirator were trafficking large amounts of crack cocaine and heroin from an unspecified city into Vermont. On April 28, 2021, VSP NIU received information from a separate source of information—who was a prospective confidential informant—that the source was in a position to purchase illegal narcotics from RIDEOUT. Investigators have not yet pursued that source's cooperation in regard to RIDEOUT, so I am not yet familiar with his or her background, criminal history, or previous interactions with investigators.

13. HSI conducted a criminal history query on RIDEOUT and discovered that RIDEOUT is a convicted felon, including a conviction for possession of a firearm as a prohibited person for which he was sentenced (as an Armed Career Criminal) on December 28, 1992, under District of Vermont case number 2:90-cr-92. RIDEOUT was most recently released from federal custody on or about March 3, 2020, following a revocation of his supervised release in that federal case.

14. On June 20, 2021, Special Agent Dale Crispin spoke with Quality Inn management, who advised that RIDEOUT was currently staying in room 125 at the Quality Inn at 2572 Shelburne Road in Shelburne, Vermont.

15. Based on the information provided by SOI and Quality Inn management, HSI agents conducted physical surveillance at the Quality Inn, where some of the doors to individual rooms are visible from the parking lot. While surveilling the Quality Inn, agents observed RIDEOUT, whom they identified from a DMV photo, enter the SUBJECT VEHICLE directly from the Quality Inn on numerous occasions. Agents have also observed RIDEOUT arrive at the Quality Inn in the SUBJECT VEHICLE. The Agents have not seen any individual other than RIDEOUT driving the SUBJECT VEHICLE. The SUBJECT VEHICLE was observed parked at the Quality

Inn as recently as June 28, 2021. At 9:22 am on June 28, 2021, RIDEOUT was observed by law enforcement driving the SUBJECT VEHICLE in the District of Vermont.

16. Based on the SOI's corroborated information, in the week of June 14, 2021, HSI conducted a consensually recorded purchase of suspected cocaine from RIDEOUT with the SOI's assistance. HSI investigators first met with the SOI and directed the SOI to place a phone call to RIDEOUT in the investigators' presence. The SOI had RIDEOUT's phone number from previous interactions with him. During the call, RIDEOUT informed the SOI that he wasn't "home" but would be returning there soon and would see the SOI there. Based on their previous interactions, the SOI concluded that RIDEOUT meant the Quality Inn when he said "home." The SOI was searched for drugs and currency, and no contraband or significant amounts of currency were located. Agents provided the SOI with $1,000 in currency to conduct the purchase. The SOI was then driven by agents to a location near the Quality Inn and dropped off. Agents maintained visual surveillance as the SOI approached the Quality Inn.

17. During surveillance prior to the consensually recorded purchase, HSI Burlington agents located the SUBJECT VEHICLE traveling south on Shelburne Road near the intersection of Shelburne Road and Pine Haven Shores Road, just north of the Quality Inn. RIDEOUT was observed as the sole occupant and driver of the vehicle. The SUBJECT VEHICLE turned onto Pine Haven Shore Road and then into the Quality Inn parking lot. Shortly thereafter, the SOI arrived at the Quality Inn parking lot and entered the SUBJECT VEHICLE.

18. The meeting between the SOI and RIDEOUT was consensually video and audio recorded using equipment provided to the SOI by investigators; the equipment also allowed investigators to listen to the encounter in real time. During the SOI's contact with RIDEOUT, agents and task force officers observed and heard RIDEOUT begin counting and then telling the

SOI, "I gave you extra." Based on my knowledge of the investigation and my training and experience, I believe RIDEOUT was referring to the amount of cocaine he provided the SOI. After RIDEOUT provided the SOI with the cocaine, RIDEOUT could be heard saying, "I got all kinds of those . . . of course, I always have . . . what bundles? Yeah, I'll sell 5 for 400. That's a half a sleeve." Based on my knowledge of the investigation and my training and experience in this geographic area, I believe RIDEOUT used the word "bundle" to mean a packet of 10 glassine baggies containing opiates typically marketed as heroin, but often containing fentanyl; a "sleeve" is a packet of 10 "bundles," so "half a sleeve" would be 50 glassine baggies. The SOI then asked, "Is that fentanyl?" RIDEOUT responded, "No, that's brown heroin." HSI agents then observed RIDEOUT and the SOI exit the SUBJECT VEHICLE.

19. Following the meeting, the SOI departed the SUBJECT VEHICLE alone and was directed by HSI agents to return to a predetermined location to be debriefed. The SOI was under constant surveillance to the predetermined location, where the SOI then turned over the suspected cocaine to HSI agents. It consisted of individually packaged baggies, each containing small amounts of white powder (some containing approximately a gram, and some containing approximately half a gram) that appeared to be cocaine. The substance tested presumptively positive as cocaine using a TruNarc field test kit and weighed 9.43 grams, inclusive of packaging.

20. The investigators observed that RIDEOUT did not exit the SUBJECT VEHICLE between his arrival at the Quality Inn and his meeting with the SOI in the SUBJECT VEHICLE, where he provided the SOI with the suspected cocaine in exchange for $1,000 in currency. Accordingly, RIDEOUT was in possession of the suspected cocaine inside the SUBJECT VEHICLE as he approached the Quality Inn for his meeting with the SOI. This confirms that

RIDEOUT both distributes controlled substances from, and travels with quantities of controlled substances in, the SUBJECT VEHICLE. It is likely, based on my training and experiences in other cases, that he uses the SUBJECT VEHICLE to obtain quantities of controlled substances from another location—either a storage (or "stash") location or a source of supply—and then travels back to the hotel for distribution. That method of distributing controlled substances is common, so that distributors do not have large quantities on or near them that can be confiscated by law enforcement or stolen in a robbery.

### Conclusion and Requests

21. Based on the foregoing information, there is probable cause to believe that information about the SUBJECT VEHICLE's location and movement will lead to: (a) the identification of potential criminal associates; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed; and/or (c) the identification of locations where drug proceeds are stored, deposited, or concealed. In order to track the movements of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I am seeking authorization to attach the GPS device to the SUBJECT VEHICLE and to activate the tracking device on the SUBJECT VEHICLE while it is in the District of Vermont. I request that the Court issue a warrant authorizing members HSI and/or Vermont State Police or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above described investigation, to: (a) install a tracking device in or on the SUBJECT VEHICLE within the District of Vermont within 10 calendar days of the warrant's issuance and to repair, replace, maintain, and remove said tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; and (b) to monitor the tracking device for a period of 45 days following the warrant's issuance. To ensure the safety of the executing

officer(s) and to avoid premature disclosure of the investigation, the United States further requests the Court authorize installation, replacement, maintenance, and removal of the tracking device during both daytime and nighttime hours.

22. In the event that the Court grants this application, there will be continued periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

23. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

24. It is requested that the warrant, this Affidavit, and the accompanying application in support thereof be sealed until further order of the Court in order to avoid premature disclosure of the investigation to the targets and to better ensure the safety of agents and others, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of HSI or Vermont State Police officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

Dated at Burlington, in the District of Vermont, this _1_ day of July, 2021.

_____
Paul Altenburg, Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this _1st_ day of July, 2021.

_____
HON. KEVIN J. DOYLE, Magistrate Judge
United States District Court
District of Vermont